UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

DARYL TORLAY,

          Plaintiff,

v.

JOSEPH NELLIGAN *et al.*,

          Defendants.

Civ. No. 19-6589

**OPINION**

THOMPSON, U.S.D.J.

# INTRODUCTION

This matter comes before the Court upon the Motion to Compel Arbitration and Stay Proceedings brought by Defendants Joseph Nelligan; Robert Beylickjian; and Merrill Lynch, Pierce, Fenner & Smith, Inc. ("Merrill Lynch") (collectively, "Defendants"). (ECF No. 17.) Plaintiff Daryl Torlay ("Plaintiff") opposes. (ECF No. 24.) The Court has decided the Motion based on the parties' written submissions and without oral argument, pursuant to Local Civil Rule 78.1(b). For the reasons stated herein, the Motion is granted.

# BACKGROUND

This breach-of-contract action arises from a soured retirement agreement. Plaintiff, a registered Financial Advisor, worked for non-party Morgan Stanley Barney LLC ("Morgan Stanley") from 1983 until his retirement in 2014. (Compl. ¶¶ 8–10, ECF No. 1.) In anticipation of Plaintiff's retirement, two agreements were executed: one between Morgan Stanley and Plaintiff and one between Morgan Stanley and Plaintiff's successor, Defendant Nelligan.

1

## I. The Contracts at Issue

First, on March 5, 2014, Plaintiff entered into the Former Financial Advisor Program Agreement with Morgan Stanley (the "Torlay Agreement"). (Torlay Agreement, Ex. P-1, ECF No. 1.) Of import to this litigation, the Torlay Agreement provided that, at the time of his retirement, Plaintiff's clients would be transferred to a new (or "active") Financial Advisor. (Compl. ¶ 11.) Defendant Beylickjian, the branch manager of Morgan Stanley at the time, designated Defendant Nelligan as the new Financial Advisor in a separate agreement discussed below. (*Id.* ¶ 13.) Plaintiff promised to "utilize best efforts to encourage [his] clients" to remain at Morgan Stanley and work with the new Financial Advisor after Plaintiff's retirement. (Torlay Agreement ¶ 2.) In exchange for that effort, Morgan Stanley agreed to share with Plaintiff future revenues generated from those clients for a period of five years after Plaintiff's retirement. (*Id.* ¶ 4; *see also* Compl. ¶ 12.) The Torlay Agreement also provided an arbitration clause:

> In the event of a dispute or controversy arising out of or in any way related to this Agreement, or arising out of or in any way related to [Plaintiff]'s employment or termination of employment with [Morgan Stanley], such dispute or controversy shall be exclusively subject to arbitration . . . and judgment upon an award issued by the arbitrator(s) may be entered in any court having jurisdiction thereof.

(Torlay Agreement ¶ 8.)

Second, the day after, on March 6, 2014, Defendant Nelligan acknowledged a memorandum titled Active Financial Advisor Understanding for Former Financial Advisor Program Arrangement of [Plaintiff] and Non-Solicitation Agreement (the "Nelligan Agreement"). (Nelligan Agreement, Ex. P-2, ECF No. 1.) The Nelligan Agreement summarized the Torlay Agreement, designated Defendant Nelligan to service Plaintiff's clients upon Plaintiff's retirement, and described a plan to share a portion of the revenues from these clients

with both Plaintiff and Defendant Nelligan. (*Id.* at 1–2.) It also provided a non-solicitation provision and an arbitration clause:

> Any controversy or claim arising out of or relating to this Memorandum (or its breach) will be settled by arbitration before the Financial Industry Regulatory Authority ("FINRA") in accordance with their respective rules, and judgment upon an award issued by the arbitrator(s) may be entered in any court having jurisdiction.

(*Id.* at 2–3.)

## II. Alleged Breaches

On August 10 and September 22, 2017, Defendants Beylickjian and Nelligan, respectively, resigned from Morgan Stanley to work at Defendant Merrill Lynch. (Compl. ¶¶ 16–17.) Plaintiff alleges that

> [d]espite a non-solicitation provision in the [Nelligan Agreement], Defendant Nelligan actively and aggressively solicited Plaintiff's former high asset level and top producing clients to leave Morgan Stanley for Defendant Merrill Lynch, which was encouraged and aided by Defendant Beylickjian, and resulted in a loss of income due under the [Torlay Agreement] to the Plaintiff.

(*Id.* ¶¶ 18–19.) Consequently, Morgan Stanley initiated litigation against both Defendants Nelligan and Beylickjian, wherein the respective courts enjoined Defendant Nelligan from soliciting any of Plaintiff's former clients or otherwise breaching the Nelligan Agreement and enjoined Defendant Beylickjian from soliciting or employing any of Morgan Stanley's employees. (*Id.* ¶¶ 20–21; *see also* Nelligan Order at 1–2, *Morgan Stanley Smith Barney LLC v. Nelligan*, Civ. No. 17-4441 (E.D. Pa. Oct. 6, 2017) (enjoining, pursuant to a stipulation, Defendant Nelligan from soliciting or initiating contact with any of Morgan Stanley's clients served in connection with the Former Financial Advisor Program); Beylickjian Order at 1–3, *Morgan Stanley Smith Barney LLC v. Beylickjian*, Civ. No. 17-7951 (D.N.J. Oct. 12, 2017) (enjoining, pursuant to a stipulation, Defendant Beylickjian from hiring or soliciting Morgan

3

Stanley employees from leaving Morgan Stanley).) Plaintiff alleges that he undertook significant and continuing efforts with his former clients to ensure that they continued as Morgan Stanley clients being serviced by Defendant Nelligan—thus entitling Plaintiff to a share of revenues generated from those clients—but Defendant Nelligan convinced those clients, in contravention of the Nelligan Agreement, to leave Morgan Stanley and become clients of Defendant Merrill Lynch. (*See* Compl. ¶¶ 15, 22, 24–25, 28.)

### III. Procedural History

Plaintiff filed the Complaint on February 22, 2019. Specifically, he alleges five counts: (1) breach of contract against Defendant Nelligan (Compl. ¶¶ 23–25), (2) interference with an agreement and/or prospective business relations against Defendant Nelligan (*id.* ¶¶ 26–29), (3) unjust enrichment against Defendant Nelligan (*id.* ¶¶ 30–33), (4) interference with an agreement and/or prospective business relations against Defendant Beylickjian (*id.* 34–37), and (5) civil conspiracy against all Defendants (*id.* ¶¶ 38–41).

On July 10, 2019, Defendants moved the Court to issue a stay pending arbitration or, alternatively, dismiss the action altogether. (ECF Nos. 17–19.) Defendants contend that Plaintiff's claims are subject to mandatory arbitration. (*See* Defs.' Br. at 27, ECF No. 17.) After an automatic extension pursuant to Local Civil Rule 7.1(d)(5) (ECF No. 23), Plaintiff opposed the Motion on August 19, 2019 (ECF No. 24). Defendants timely replied on September 6, 2019. (ECF No. 27.) The Motion is currently before the Court.

## **LEGAL STANDARD**

Where a contract provides for arbitration, "an emphatic federal policy in favor of arbitral dispute resolution" guides the district court. *KPMG LLC v. Cocchi*, 565 U.S. 18, 21 (2011) (per curiam) (internal quotation marks omitted) (quoting *Mitsubishi Motors Corp. v. Soler Chrysler-*

4

*Plymouth, Inc.*, 473 U.S. 614, 631 (1985)); *see* Federal Arbitration Act ("FAA"), 9 U.S.C. § 2. When a party refuses to submit to arbitration pursuant to a valid contract provision, the party seeking to arbitrate may petition the court for an order compelling arbitration. 9 U.S.C. § 4. It is well-established that "[a]ny doubt concerning the scope of arbitrability should be resolved in favor of arbitration." *Mitsubishi Motors Corp.*, 473 U.S. at 626 (quoting *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24–25 (1983)); *see also Gray Holdco, Inc. v. Cassady*, 654 F.3d 444, 451 (3d Cir. 2011).

For this presumption in favor of arbitration to apply, however, a valid contract or agreement to arbitrate must exist between the parties. The Court must find that "(1) there is an agreement to arbitrate and (2) the dispute at issue falls within the scope of that agreement." *Cent. Indem. Co. v. Certain Underwriters at Lloyd's*, 584 F.3d 513, 523 (3d Cir. 2009). The contract law of the relevant state governs these determinations. *See Aliments Krispy Kernels, Inc. v. Nichols Farms*, 851 F.3d 283, 288–89 (3d Cir. 2017) (citations omitted).

When deciding a motion to compel arbitration and where "the non-movant has come forward with enough evidence in response to the motion to compel arbitration to place the question [of arbitrability] in issue," courts employ the standard for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 774 (3d Cir. 2013). At that point, the court must determine (1) whether a genuine issue of material fact exists in regard to arbitrability, and (2) whether one party is entitled to judgment as a matter of law. *See Trap Rock Indus. v. Local 825, Int'l Union of Operating Eng'rs*, 982 F.2d 884, 887 (3d Cir. 1992).

## DISCUSSION

### I.     FINRA's Code Does Not Compel Plaintiff to Arbitrate

Defendants first contend that Plaintiff, Defendant Nelligan, and Defendant Beylickjian all signed the Uniform Application for Securities Registration or Transfer ("Form U-4") subjecting them to mandatory arbitration pursuant to FINRA's Code of Arbitration Procedure for Industry Disputes ("FINRA's Code").  (Defs.' Br. at 9–13; *see also* Form U-4, Ex. 2, ECF No. 17-5 (excerpted copy).)  FINRA Rule 13200 provides that "a dispute must be arbitrated under [FINRA's] Code if the dispute arises out of the business activities of a member or an associated person and is between or among: Members; Members and Associated Persons; or Associated Persons."  Defendants submit that Plaintiff, Defendant Nelligan, and Defendant Beylickjian are all "Associated Persons" and Defendant Merrill Lynch is a "Member" such that the issues in this action are subject to mandatory arbitration.  (Defs.' Br. at 13.)

However, this contention is not proper at this stage in the litigation.  Defendants present no evidence that the parties even signed the Form U-4.  They attach a blank copy of the Form U-4 as an exhibit to their papers, but they do not provide any document purporting to be a signed Form U-4 or any affidavit maintaining that the parties had in fact signed a Form U-4.  Defendants fail to carry their burden that arbitration is warranted in this regard.

### II.    Equitable Estoppel Compels Plaintiff to Arbitrate

Plaintiff's claims derive from both the Torlay Agreement, to which Defendants are non-signatories, and the Nelligan Agreement, to which Plaintiff is a non-signatory.  (*See* Compl. ¶¶ 23–37 (alleging that Defendants breached the Nelligan Agreement, under Count I, and interfered with the Torlay Agreement, under Counts II and IV).)  Both agreements, however, contain an arbitration clause.  Although, generally, "[t]he presumption in favor of arbitration does not

6

extend . . . to non-signatories to an [arbitration] agreement," *Griswold v. Coventry First LLC*, 762 F.3d 264, 271 (3d Cir. 2014), a party "can be compelled to arbitrate under an agreement, even if he or she did not sign that agreement, if [state] common law principles of agency and contract support such an obligation on his or her part," *Bouriez v. Carnegie Mellon University*, 359 F.3d 292, 294 (3d Cir. 2004) (internal citation omitted). Defendants argue that Plaintiff should be equitably estopped from avoiding the arbitration clauses in these two agreements, which requires the Court to utilize two theories of equitable estoppel.[1]

Under the first theory, Defendants (signatories) ask the Court to enforce the arbitration agreement in the Nelligan Agreement against Plaintiff (non-signatory). They do so, presumably, because Plaintiff brings claims relating to this agreement in Count I, which alleges that Defendant Nelligan breached the Nelligan Agreement.

> [C]ourts have held non-signatories to an arbitration clause when the non-signatory knowingly exploits the agreement containing the arbitration clause despite having never signed the agreement. . . . [This theory] recognizes that a party may be estopped from asserting that the lack of his signature on a written contract precludes enforcement of the contract's arbitration clause when he has consistently maintained that other provisions of the same contract should be enforced to benefit him.

*E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 199–200 (3d Cir. 2001) (internal citations and quotation marks omitted). A "person may . . . be equitably estopped from challenging an agreement that includes an arbitration clause when

---

[1] Neither party seems to dispute that the Nelligan Agreement is governed by the law of New Jersey (*see* Nelligan Agreement at 3 (forum selection clause)), and that the Torlay Agreement is governed by the law of New York (*see* Torlay Agreement ¶ 11.b (same)). Because New Jersey and New York both recognize that a signatory to a contract may compel a non-signatory, and vice versa, to arbitrate under certain circumstances by means of equitable estoppel, no conflict of law exists. *Compare Hirsch v. Amper Fin. Servs., LLC*, 71 A.3d 849, 856–62 (N.J. 2013) (explaining the contours of the equitable estoppel doctrine), *with Oxbow Calcining USA Inc. v. Am. Indus. Partners*, 96 A.D.3d 646, 649–50 (N.Y. App. Div. 2012) (same).

that person embraces the agreement and directly benefits from it." *Bouriez*, 359 F.3d at 295. "This prevents a non-signatory from 'cherry-picking' the provisions of a contract that it will benefit from and ignoring other provisions that don't benefit it or that it would prefer not to be governed by (such as an arbitration clause)." *Invista S.à.r.l. v. Rhodia, SA*, 625 F.3d 75, 85 (3d Cir. 2010).

Plaintiff seems to be strategically selecting particular provisions of the Nelligan Agreement by which he wishes to observe. Although Plaintiff explicitly alleges in Count I that Defendant Nelligan breached the Nelligan Agreement by contravening its non-solicitation clause (Compl. ¶¶ 18, 22–25) and even attaches the Nelligan Agreement as an exhibit to his Complaint, Plaintiff wishes to ignore the unambiguous arbitration clause in the Nelligan Agreement. Plaintiff points to, and even attaches as exhibits, the court orders in separate matters enjoining Defendants Nelligan and Beylickjian from soliciting or initiating contact with Plaintiff's former clients. (*See id.* ¶¶ 20–21; Nelligan Order at 1–2; Beylickjian Order at 1–3.) Plaintiff essentially embraces the non-solicitation clause in the Nelligan Agreement but, at the same time, distances himself from the arbitration clause also contained therein. Equitable estoppel seeks to prevent this kind of gamesmanship. *See E.I. DuPont*, 269 F.3d at 200 ("[C]ourts prevent a non-signatory from embracing a contract, and then turning its back on the portions of the contract, such as an arbitration clause, that it finds distasteful."); *see also, e.g.*, *Sanford v. Bracewell & Guiliani, LLP*, 618 F. App'x 114, 118 (3d Cir. 2015) (finding non-signatory bound to arbitration agreement where plaintiff asserted claim for breach of a provision in that same contract because by "elect[ing] to proceed under a claim for breach of the Engagement Agreement, [plaintiff was] bound by [all of] its terms, including the arbitration provision"); *Neal v. Asta Funding, Inc.*, 2016 U.S. Dist. LEXIS 85163, at *57–58 (D.N.J. June 30, 2016) (compelling non-signatory to

8

arbitrate because "it is clear that [plaintiff] attempted to use the contract as a sword at the same time as using his non-signatory status as a shield" by bringing breach-of-contract claim but seeking to avoid the arbitration clause contained therein).

Even if the first theory of equitable estoppel were to compel arbitration for only some of Plaintiff's claims, the second theory, in conjunction with the first, covers the totality of Plaintiff's claims. Under the second theory, Defendants (non-signatories) ask the Court to enforce the arbitration clause in the Torlay Agreement against Plaintiff (signatory). They do so, again presumably, because Plaintiff alleges in Counts II and IV that Defendants interfered with the Torlay Agreement.

> [C]ourts have bound a signatory to arbitrate with a non-signatory at the nonsignatory's insistence because of the close relationship between the entities involved, as well as the relationship of the alleged wrongs to the nonsignatory's obligations and duties in the contract . . . and [the fact that] the claims were intimately founded in and intertwined with the underlying contract obligations.

*E.I. DuPont*, 269 F.3d at 199; *see also GE v. Deutz AG*, 270 F.3d 144, 156 n.4 (3d Cir. 2001) (collecting cases). "In determining whether a non-signatory is closely related to a contract, courts consider the non-signatory's ownership of the signatory, its involvement in the negotiations, the relationship between the two parties and whether the non-signatory received a direct benefit from the agreement." *In re McGraw-Hill Glob. Educ. Holdings LLC*, 909 F.3d 48, 63 (3d Cir. 2018) (quoting *Carlyle Inv. Mgmt. LLC v. Moonmouth Co. SA*, 779 F.3d 214, 219 (3d Cir. 2015)). Generally, "there [must be] a sufficiently close relationship to justify doing so, and the circumstances warrant that result." *Invista*, 625 F.3d at 85.

Defendants, non-signatories, have a sufficiently close nexus to Plaintiff and the Torlay Agreement to estop Plaintiff from avoiding the arbitration provision to which Plaintiff agreed in the Torlay Agreement. First, the claims in the Complaint relate directly to the Torlay

9

Agreement. Plaintiff not only alleges that Defendants denied him benefits promised under the Torlay Agreement (*see* Compl. ¶¶ 26–29, 34–37), but he intimates that Defendants somehow *breached* a contract to which they had not even signed (*id.* ¶ 1 (alleging that this action is "a result of a breach of Two [*sic*] (2) agreements")).

Second, Plaintiff blurs the boundary lines—though faint already—between the Torlay Agreement and Nelligan Agreement. The Torlay Agreement actually requires the cooperation of Defendant Nelligan: it requires Plaintiff to "introduc[e] the active FA [Defendant Nelligan] to the Clients and provid[e] the active FA [Defendant Nelligan] with Client Account information and history." (Torlay Agreement ¶ 2.) The Torlay Agreement also provides that Plaintiff and Defendant Nelligan share respective percentages of revenues generated from Plaintiff's former clients. (*Id.* ¶ 4a–b.) Without Defendant Nelligan's participation, Plaintiff's former clients would not be serviced and Plaintiff would not be entitled to any portion of future revenues generated therefrom.

Moreover, a plain reading of the Nelligan Agreement demonstrates its strong association with the Torlay Agreement, almost serving as a supplement to the Torlay Agreement. The Nelligan Agreement explicitly references Plaintiff by name, outlines the contours of the Torlay Agreement, and designates Defendant Nelligan to service Plaintiff's clients upon Plaintiff's retirement. And the Torlay Agreement and Nelligan Agreement were signed a mere one day apart from one another. Though signatories to different documents, Plaintiff and Defendant Nelligan each, through the Torlay Agreement and Nelligan Agreement respectively, reasonably expected the same outcome: that (1) Plaintiff would retire; (2) upon his retirement, Plaintiff would encourage his clients to maintain their accounts with Defendant Nelligan; (3) Defendant Nelligan would then service these clients; so (4) both Plaintiff and Defendant Nelligan would

receive a portion of the revenues generated from these clients. Near-mirror-image expectations derived from two supposedly separate documents demonstrate the proximity of the parties and their agreements.

Simply put, Plaintiff "cannot . . . have it both ways" insofar as "he cannot, on the one hand, seek to hold the non-signatory [Defendant Nelligan] liable pursuant to duties imposed by the [Torlay A]greement, which contains the arbitration provision, but, on the other hand, deny the arbitration's applicability because [Defendant Nelligan] is a non-signatory." *Hoffman v. Finger Lakes Instrumentation, LLC*, 789 N.Y.S.2d 410, 415 (Sup. Ct. 2005) (internal citations omitted) (estopping plaintiff where "condition[] [was] easily met" in regard to "[w]hen each of a signatory's claims against a nonsignatory makes reference to or presumes the existence of the written agreement, the signatory's claims arise out of and relate directly to the written agreement"); *see also Carlyle Inv. Mgmt.*, 779 F.3d at 219 (permitting non-signatory to enforce forum selection clause against signatory because parties were closely related). Accordingly, the claims advanced in the Complaint—whether relating to the Nelligan Agreement, the Torlay Agreement, or both—oblige Plaintiff to arbitrate this action.

**III.     The Arbitration Provisions Are Not Unenforceable under New Jersey Law**

Plaintiff finally contends that, even assuming Defendants could rely upon the arbitration provisions in the Torlay Agreement and Nelligan Agreement, those provisions are unenforceable under New Jersey law. (*See* Pl.'s Br. at 4–7, ECF No. 24.) Plaintiff relies on two opinions from the New Jersey Supreme Court, but those opinions actually undermine, rather than support, his contention. The opinions in *Garfinkle v. Morristown Obstetrics & Gyneclogy Assocs., P.A.*, 773 A.2d 665 (N.J. 2001), and *Atalese v. U.S. Legal Servs. Grp., L.P.*, 99 A.3d 306, 309 (N.J. 2014), both refused to compel arbitration, but only in regard to the respective plaintiffs' *statutory*

claims, not their contractual claims. In *Garfinkle*, plaintiff brought suit against his former employer under a state statute, the New Jersey Law Against Discrimination ("NJLAD"), N.J.S.A. § 10:5-1. 773 A.2d at 667. Although the court found that the arbitration agreement in the employment contract was insufficient to compel the parties to arbitrate plaintiff's claim, its holding was limited to plaintiff's *statutory* NJLAD claim. Indeed, the court explicitly underscored that the "language [in the employment contract] suggests that the parties intended to arbitrate only those disputes involving a contract term, a condition of employment, or some other element of the contract itself. . . . [T]he parties intended disputes over the terms and conditions of the contract, not statutory claims, to be the subject of arbitration."[2] *Id.* at 672. Similarly, in *Atalese*, the court focused exclusively on plaintiff's waiver of *statutory* claims, not contractual claims, and concluded that plaintiff's statutory claims fell outside the scope of the arbitration agreement. *See* 99 A.3d at 316 (concluding that "the wording of the service agreement did not clearly and unambiguously signal to plaintiff that she was surrendering her right to pursue her *statutory claims* in court" (emphasis added)). Because Plaintiff brings only contractual common law claims, and not statutory claims, that "aris[e] out of or in any way related to" the Torlay Agreement and Nelligan Agreement, these cases are inapposite and unpersuasive. Accordingly, the arbitration provisions in the Torlay Agreement and Nelligan Agreement are not unenforceable under New Jersey law.

---

[2] The terms of the arbitration agreement in *Garfinkle* almost mirror the terms in the two agreements at issue in the instant case. *Compare Garfinkle*, 773 A.3d at 668 (quoting agreement which required arbitration in "any controversy or claim arising out of, or relating to, this Agreement or the breach thereof"), *with* Nelligan Agreement at 2–3 (requiring arbitration in "[a]ny controversy or claim arising out of or relating to this Memorandum (or its breach)"), *and* Torlay Agreement ¶ 8 (requiring arbitration "[i]n the event of a dispute or controversy arising out of or in any way related to this Agreement, or arising out of or in any way related to [Plaintiff]'s employment or termination of employment with [Morgan Stanley]").

## **CONCLUSION**

For the foregoing reasons, Defendants' Motion is granted. An appropriate Order will follow.

Date: September 18, 2019

*/s/ Anne E. Thompson*
ANNE E. THOMPSON, U.S.D.J.